## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATHANIEL B. APPLEBY-EL | * | |
| Plaintiff | * | |
| v | * | Civil Action No. PWG-19-1868 |
| WEXFORD HEALTH SOURCES, | * | |
| COMMISSIONER DAYENA CORCORAN,[1] | | |
| MAHBOOB ASHRAF, | * | |
| RNP KRISTA BILAK, *NKA  Krista Self*, | | |
| RNP HOLLY PIERCE, *NKA Holly Hoover* | * | |
| WARDEN FRANK B. BISHOP, JR. | | |
| | * | |
| Defendants | | |
| | * | |
| | *** | |

## MEMORANDUM OPINION

Self-represented plaintiff Nathaniel B. Appleby-El, is a Maryland inmate incarcerated at North Branch Correctional Institution ("NBCI").  He alleges in this verified Complaint filed pursuant to 42 U.S.C. § 1983 that he was provided constitutionally inadequate ophthalmologic care and also raises state law claims of negligence and medical malpractice.  Defendants Mahboob Ashraf, M.D.; Krista Self (formerly Krista Bilak); and Holly Hoover, CRNP, (formerly Holly Pierce) each filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.  ECF Nos. 23, 24, 28.  Defendant Wexford Health Sources, Inc., filed a Motion to Dismiss.  ECF No. 26. Plaintiff has filed an opposition (ECF No. 30), to which Defendants Ashraf, Self, Hoover, and Wexford (collectively, the "Medical Defendants"), filed a Reply.  ECF No. 34.  Also pending is

---

[1]  Counsel in the Office of the Attorney General has entered an appearance on behalf of former Commissioner of the Department of Public Safety and Correctional Services, Dayena Corcoran, and former Warden of NBCI, Frank B. Bishop, Jr., but did not file a Response on behalf of these defendants. ECF No. 15.

Plaintiff's Motion for Leave to File a Surreply (ECF No. 36), which is opposed by the Medical Defendants and will be denied.  ECF No. 37.

For reasons discussed below, the Court will construe Ashraf, Self, and Hoover's Motions as Motions for Summary Judgment and, because the Court finds there are genuine disputes of material fact, the Motions for Summary Judgment will be denied.  Wexford's Motion to Dismiss will also be denied.  Plaintiff will be granted twenty-eight days to file a Motion to Appoint counsel.

## Background

At the heart of this Complaint are Plaintiff's allegations that he received constitutionally inadequate treatment in violation of his rights under the Eighth Amendment for a retinal detachment in his right eye, a torn retina in his left eye, and glaucoma in both eyes due to lengthy delays in treatment which resulted in irreversible loss of vision.  Plaintiff provides the following chronology of events which is supported by the record evidence.

On May 23, 2016, while temporarily housed at Patuxent Institution, Plaintiff was "gently rubbing his itchy, red and irritated right eye" when he suddenly experienced blindness in that eye. ECF No. 1 at 6.  He was taken to the medical unit and scheduled to see an eye doctor.  *Id.* at 6–7.

Two days later, Plaintiff was transferred to NBCI.  Upon arrival, he informed Nurse Dawn Hawk during intake screening of the "blindness in his right eye."  *Id.* at 7.  He informed Hawk that he thought his retina was detached and needed to be treated as a medical emergency.  Hawk instructed him to use the sick call process to see "optical" for his concerns.  *Id;* ECF No. 1-1 at 2.

On May 26, 2016, Plaintiff submitted a sick call slip to see an ophthalmologist as a medical emergency for his sudden loss of vision in his right eye, "what he suspected the cause to be, and why it needed to be treated" as an emergency.  ECF No. 1 at 8.  "Two weeks and three more sick call requests later," on June 9, 2016, Plaintiff stopped James Hunt, R.N., during medical rounds to

complain about his eye and unanswered sick call slips.  *Id.*  Nurse Hunt investigated Plaintiff's concerns and scheduled him to see Dr. Ashraf on June 14, 2016.  *Id; see also* ECF No. 1-1 at 3.

On June 14, 2016, Plaintiff was seen by Dr. Ashraf.  *Id.* at 9; ECF No. 1-1 at 4, 6.  Plaintiff reported intermittent right eye pain, photophobia, and diplopia (double vision).  Plaintiff alleges that Krista Bilak (Self), a nurse practitioner, was responsible for his initial screening at sick call, and "passed it on to Ashraf as a non-emergency."  ECF No. 1 at 5.  Plaintiff states Dr. Ashraf agreed that Plaintiff's loss of vision needed expeditious treatment, and Dr. Ashraf attempted to bypass optometry and referred Plaintiff directly to Dr. Summerfield, an ophthalmologist.  *Id.* at 9.

Plaintiff states that an "unnamed collegial" denied Dr. Ashraf's ophthalmology referral request and placed him on a waiting list for optometry instead.  *Id.* at 10; ECF No. 1-1 at 8.  Plaintiff maintains that "Dr. Ashraf still had the authority to deem it a 'medical emergency'" so that Plaintiff could be examined at Cumberland Valley Retina Consultants ("CVRA"), "where they ultimately ended up taking him anyway three months later, on March 13, 2017."  ECF No. 1 at 10.  Plaintiff states that he was scheduled to see an optometrist on July 28, 2016, but Krista Self cancelled the appointment.  *Id.* at 5; *see also* ECF No. 23-4 at 12.  Plaintiff asserts that had he been seem by an optometrist on July 28, 2016, his prognosis would have been much better and much of his vision could have been restored.  ECF No. 1 at 5.

On July 27, 2016, optometrist[2] M.W. Brooke examined Plaintiff.  Dr. Brook's medical notes report that Plaintiff stated that he "can't see out of OD for – 30 days ago." ECF 23-4 at 13. Dr. Brooke left the assessment portion of the record blank and the report does not indicate whether he examined Plaintiff for a retinal detachment.  Dr. Brooke made no referral to ophthalmology or other recommendation for Plaintiff's treatment.  *Id.*

---

[2] During this time on site optometry services were provided by Prison Operation Systems Inc. and on-site ophthalmology services were provided by Summerfield Eye Associates, LLC.  Decl. of Joseph Ebbitt, ECF No. 23-6.

On December 5, 2016, Dr. Ashraf saw Plaintiff in the chronic care clinic, and again referred him to Dr. Summerfield.  Dr. Ashraf noted that Plaintiff was losing vision in his right eye due to the retinal detachment, had blurred vision, right eye pain, photophobia, and diplopia.  The medical report reads in part "*Pt is losing vision on right eye collegial denied earlier for ophthalmologist."* ECF No. 1-1 at 9; ECF No. 23-4 at 14–15 (emphasis added).

On December 14, 2016, Plaintiff was sent for photographs of his retinas.  ECF No. 23-4 at 19.

On February 27, 2017, Plaintiff was seen again by Dr. Brooke, who noted Plaintiff had suffered loss of visual acuity in the right eye for more than one year.  The plan was to refer Plaintiff to an ophthalmologist. Dr. Brooke wrote in his report Plaintiff had been "*referred to ophthalmology but lost in the system*."  ECF No. 1-1 at 11; ECF No. 23-4 at 20. (emphasis added).

On March 8, 2017, Dr. Paul Goodman, an ophthalmologist, examined Plaintiff, assessing him as having a complete retinal detachment in his right eye and a "horseshoe tear and sub-retinal fluid in the left eye.  ECF No. 1-1 at 12.  Dr. Goodman recommended Plaintiff's urgent referral to a retina specialist.  *Id.*

On March 13, 2017, Plaintiff was sent to CVRA for a second opinion.  There, Allen Hu, M.D., diagnosed Plaintiff with a complete retinal detachment of the right eye and a major tear and early retinal detachment in his left eye.  *Id.* at 13; ECF No. 1 at 10.  Specifically, Dr. Hu diagnosed Plaintiff as having a total retinal detachment in his right eye, vitreous degeneration in both eyes, degenerative macula in both eyes, and lattice degeneration of the retina of the left eye.  ECF No. 1-1 at 10. Dr. Hu wrote "[p]atient understands that macula has been off for [more than] ten months, so the visual potential is very guarded." *Id.*  Dr. Hu recommended surgery to recover visual acuity

and reattachment of the retina of the right eye and laser surgery on the left eye to prevent a complete

retinal detachment, which could leave him totally and permanently blind. *Id.*

Over one-month later, on April 26, 2017, Dr. Goodman placed a consultation request for

Plaintiff's follow-up care. ECF No. 1-1 at 18. The consultation reads:

> 58 yo male sent for retina evaluation in March for total retinal detachment right
> eye, large retinal tear with impending detachment left eye, was seen by Cumberland
> valley retina and recommended for urgent surgical repair. Has not been returned
> for follow up. Recommend urgent surgical repair of his left retinal tear as well as
> his retinal detachment in the right eye.

*Id.* Goodman indicated that he had spoken with Bill Beeman, a medical administrator, to explain

that Plaintiff urgently needed the surgical repair, and Beeman said it would be taken care of ASAP

before the end of the week. *Id.* at 19; ECF No. 1 at 14–15.

On May 24, 2017, Plaintiff was seen at the Wilmer Eye Institute at Johns Hopkins Hospital

(Wilmer"). ECF No. 23-7 at 2–8. The medical report notes that Plaintiff presented open angle

glaucoma of both eyes-severe stage and a retinal detachment of the right eye. *Id.* at 6–7. The

prognosis for the retinal detachment was described as poor. *Id.* at 7.

On June 19, 2017, Plaintiff underwent laser surgery on his left eye at Wilmer. ECF No. 1

at 15, 16; ECF No. 23-7 at 11, 14. Plaintiff's medical providers at Wilmer recommended that he

be scheduled for retinal surgery on his right eye, return to the retina clinic for reassessment of his

left eye, and to schedule him for the Wilmer glaucoma clinic. ECF No. 23-7 at 15.

On August 25, 2017, approximately fifteen months after first reporting sudden loss of

vision in his right eye, Plaintiff underwent surgery at Wilmer to repair the detached retina in his

right eye. The surgery was successful, but according to Plaintiff required at least two additional

follow-up surgical procedures. ECF No. 1 at 16; ECF No. 1-1 at 20; ECF No. 23-7 at 24, 33, 42.

Plaintiff states that after his August 2017 surgery to repair and reattach his retina, he regained 50

to 60% of his vision and could see large objects from close range but required at least two more follow-up surgical procedures. ECF No. 1 at 16, 18–21. He claims he had follow-up appointments scheduled at Wilmer for October 2, 2017 and November 29, 2017 but was then "lost in the system for just over one year." *Id.* at 27, 42. He asserts his right eye surgery required "intensive post-operative care" to guard against infection and major complications, which he did not receive once he returned to NBCI. *Id.* at 16–17.

After his discharge from Wilmer, Plaintiff was taken to Western Correctional Institution infirmary where a nurse removed his bandages and taught him how to apply ophthalmic drops and antibacterial ointment. *Id.* at 17. Plaintiff then returned to NBCI where he maintains that he was never seen by any Wexford medical providers for post-surgical care. *Id.*; ECF No. 23-4 at 42. Plaintiff alleges Dr. Ashraf prescribed Tramadol for post-surgical pain management, but Holly Hoover stopped the medication two days after his surgery. ECF No. 1 at 17; *see also* ECF No. 23-4 at 53–54. Further, Nurse Hoover failed to process prescriptions for Gonak and "Prednisolone eye drops" ordered by Wilmer ophthalmologists. ECF No. 1 at 17; ECF No. 23-7 at 41. Plaintiff asserts after the pressure in his right eye increased to a dangerously high level, Defendants withheld latanoprost, a medical treatment for reducing pressure in the eye. ECF No. 1 at 20. Plaintiff asserts Defendants never checked the pressure in his eyes or examined them for possible infection. *Id.* at 21. Further, he asserts that his eye drop prescriptions were not timely refilled and he had to file numerous Administrative Request Procedure ("ARP") forms to obtain refills; each taking 2-3 weeks or more. *Id.* at 22. Plaintiff alleges that by denying him "any and all post-operative care, withholding his pain medicine, and constantly disrupting his treatment with pressure-lowering eye drops, causing the pressure to remain critically high in his right eye; the optic nerve was destroyed, leaving him completely and permanently blind in his right eye." *Id.* at 23.

On September 12, 2017, Dr. Ashraf noted that Plaintiff had not received his eye medication and placed an urgent request for the medication.  Dr. Ashraf noted that Plaintiff had eye surgery on August 26, 2017 and needed an urgent consultation.  ECF No. 23-4 at 52–54.  On September 14, 2017, Dr. Ashraf indicated that Plaintiff was going to be seen at Wilmer on September 18, 2017 for follow up.  ECF No. 23-4 at 55–56.[3]

On December 26, 2018, Plaintiff was transported to Wilmer.  The medical report from that visit reads in part:

> **Nathaniel Appleby returns after being lost to follow-up for 1 year.**  At the time of his last visit, the plan was to remove the oil and cataract from the right eye, which was scheduled for 3/2018 but did not happen.  Today, he reports that he has not seen anything out of his right eye since 4/2018- vision has been completely black since then, and the pupil has been gradually becoming more white.

 ECF No. 1-1 at 22. (emphasis added).  Plaintiff was assessed with open angle glaucoma of both eyes, severe stage.  *Id.*  The medical assessment and plan in the report further states in part:

> **After being lost to follow-up for 1 year, Mr. Appleby has lost all vision in his right eye due to glaucoma.**  Glaucomatous damage in his left eye as progressed as well.
>
> **Right eye: No light perception vision with elevated intraocular pressure.  Vision is irreversibly lost due to glaucoma.**  [ ]
>
> Left eye worse inferior arcuate defect.  Intraocular pressure is 17, which is above previously set target of 12.  Will increase topical intraocular pressure-lowering therapy as well.

*Id.* at 23. (emphasis added).  Follow-up was recommended in 3-4 weeks.  *Id.*

Plaintiff contends "[t]here is a culture within the Maryland Department of Corrections that compels all staff, from the tier officers who first hear an inmate's medical complaint, to the chief physician, and to the Warden; to treat such complaints as being altogether false or grossly exaggerated, unless they see blood or some visible injury."  ECF No. 1 at 11–12.

---

[3]  The appointment was rescheduled.  ECF No. 23-4 at 27.

Plaintiff seeks compensatory damages of $1 million dollars against each Defendant jointly and severally, punitive damages $1 million dollars against each Defendant jointly and severally and declaratory relief. ECF No. 1 at 43.

## Standard of Review

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specifically, a plaintiff must establish "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The court need not accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). Well-pleaded facts as alleged in the complaint are accepted as true. *See Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011). Factual allegations must be construed "in the light most favorable to [the] plaintiff." *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (quoting *Battlefield Builders, Inc. v. Swango,* 743 F.2d 1060, 1062 (4th Cir. 1984)).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23. On those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In this inquiry, a court must view the facts and the reasonable inferences drawn "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The

mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." *Harrods*, 302 F.3d at 244 (quoting 10B Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

**Discussion**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute

10

and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care. *Estelle*, 429 U.S. at 104–05. Importantly, a judicial assessment of deliberate indifference has two aspects—an objective inquiry and a subjective inquiry. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

To satisfy the objective inquiry of a deliberate indifference claim, "the inmate's medical condition must be 'serious'—'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). To satisfy the subjective inquiry of a deliberate indifference claim, the plaintiff must show that the official "knows of and disregards an excessive risk to inmate safety or health." *Farmer v Brennan,* 511 U.S. 825, 837 (1994). "Where a deliberate indifference claim is predicated on a delay in medical care . . . there is no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F.App'x 745, 755 (4th Cir. 2018) (citing *Webb v. Hamidullah*, 281 F.App'x 159, 166–67 (4th Cir. 2008)). "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010) (vacating and remanding summary

dismissal of complaint alleging three-month delay in dental treatment); *see Smith v. Smith*, 589 F.3d 736, 738–39 (4th Cir. 2009) (finding claim of delay in administering prescribed medical treatment stated an Eighth Amendment claim).

A corporation cannot be held liable under § 1983 unless the entity's policies or customs caused one or more of its employees to deprive the plaintiff of a federally protected right. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 690–92 (1978); *see also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). An official policy may be created "by making a single decision regarding a course of action in response to particular circumstances." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citing *Pembaur v. Cincinnati*, 475 U.S. 468, 481 (1986)).

Plaintiff's verified complaint is based on personal knowledge and therefore acts as an opposing affidavit for summary judgment purposes. *See Carter v. Fleming*, 879 F.3d 132, 141 n.8 (4th Cir. 2018) ("'[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.'" (alteration in original) (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ) ); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (holding that factual allegations contained in a verified complaint may establish a prima facie case under § 1983 sufficient to defeat summary judgment). Here, the parties do not dispute that Plaintiff's eye conditions were serious and needed urgent attention, as recognized by medical reports completed by Drs. Ashraf, Goodman, Hu, and the Wilmer ophthalmologists. Yet, the record reflects Plaintiff's medical needs were delayed for

lengthy periods of time, despite recognition of Plaintiff's serious medical ophthalmologic needs. These delays individually and cumulatively appear to have resulted in the irreversible loss of sight in Plaintiff's right eye.   Clearly, Plaintiff has suffered substantial harm from lengthy delays in treating his eye conditions, and his eye condition and or recovery may have been exacerbated by the alleged lack of post-surgical care he received upon discharge back to NBCI. The record also suggests that a number of other parties may have participated in Plaintiff's eye care including the contractor for optometric services, "collegial review," and schedulers.

Viewing the record in the light most favorable to Plaintiff, the nonmovant, the parties have provided verified exhibits and declarations that show there are genuine disputes of material fact whether the delay in treating Plaintiff's eyes both before and after the surgery constitutes deliberate indifference to support an Eighth Amendment claim.   Accordingly, the Motions for Summary Judgment filed by Defendants Ashraf, Self, and Hoover will be denied.

Wexford argues that the claims against it should be dismissed because Plaintiff has not presented any evidence of a policy or custom resulting in a constitutional rights deprivation.   ECF No. 26.   Wexford argues that Plaintiff's allegation there is a "culture" within the Maryland Division of Correction that "compels all staff" to treat inmate medical complaints as false or grossly exaggerated unless they see blood or physical injury and medical personnel make medical decisions based on cost rather than patient need is insufficient to state a claim.   Although these allegations do not identify a specific policy or practice by name, the remaining allegations in the complaint, when taken together and viewed in the light most favorable to Plaintiff as true, are sufficient to draw a reasonable inference that Wexford had knowledge of the substantial risk of serious harm facing Plaintiff to defeat the Motion to Dismiss.   Therefore, Wexford's Motion to Dismiss will be denied.

Recognizing that Plaintiff is a visually impaired, self-represented litigant who is proceeding in forma pauperis and navigating medical care that has involved many different providers with differing authority to order his care and follow-up, including on-site employees of state contractual providers, unidentified members of "collegial review," schedulers, and special consultants, and the relevant facts regarding his medical care are exclusively in the control of the opposing party, the Court finds that the interests of justice warrant appointment of counsel to assist Plaintiff in pursuing his claims, and will issue an order appointing counsel to represent him in this case. After counsel is appointed, a scheduling order will issue, and I will hold a conference call to determine whether appointed counsel requests to file an amended complaint, or to proceed with the complaint that has been filed.

## Conclusion

For the foregoing reasons, the Court will deny Defendants Ashraf, Self, and Hoover's Motions for Summary Judgment. Wexford's Motion to Dismiss will be denied. I will appoint counsel to represent Plaintiff. A separate order follows.

January 5, 2021_____  
Date

_____/S/_____
Paul W. Grimm  
United States District Judge

14